COOLEY LLP
MAZDA K. ANTIA (214963)
(mantia@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone: +1 858 550 6000
Facsimile: +1 858 550-6420

JAMIE D. ROBERTSON (326003)
(jdrobertson@cooley.com)
110 N. Wacker Dr. suite 4200
Chicago, Illinois 60606-1511
Telephone: +1 312 881-6598
Facsimile: +1 312 881-6500

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MHA LONG TERM CARE NETWORK, INC., a Delaware corporation,<br><br>Defendant. | Case No. **'24CV2482 DMS VET**<br><br>**COMPLAINT** |

Plaintiff MedImpact Healthcare Systems, Inc. ("MedImpact" or "Plaintiff") brings this Complaint for declaratory relief, breaches of contract and the implied covenant of good faith and fair dealing, interference with contractual relations, and violation of California's unfair competition law against Defendant MHA Long Term Care Network, Inc. ("MHA" or "Defendant"). Defendant's unlawful, tortious, and anticompetitive actions described herein will cause immediate and significant harm to MedImpact and to extremely vulnerable individuals – many of whom are senior citizens – who have chronic health conditions, physical

disabilities, or cognitive impairments, such as dementia or Alzheimer's disease, and who reside in nursing homes, assisted living facilities, or similar long-term care facilities due to their age, disability, or because they suffer from severe or debilitating health issues, and/or require frequent medical supervision.

## INTRODUCTION

1. MedImpact and other pharmacy benefit managers ("PBMs") play a crucial role in the provision of prescription drug services in the United States, including to people who, because of their advanced age, physical, or medical condition, reside in long-term care facilities, skilled nursing facilities, assisted living facilities, and nursing homes (collectively, "Care Settings").

2. MedImpact administers prescription drug benefits for its health benefit plan sponsor clients to ensure that their clients' members, including many of the most vulnerable people across the country – specifically, as relevant here, elderly individuals who are members of Medicare Part D prescription plans and reside in Care Settings – have adequate and dependable access to their prescription medications. In order to ensure that these vulnerable individuals maintain uninterrupted access to their necessary and life-saving medications, MedImpact contracts with specialized long-term care pharmacies around the country.

3. Niche individual or small group long-term care pharmacies often contract with Pharmacy Services Administrative Organizations ("PSAOs") like MHA which will then contract with a PBM on behalf of the pharmacies. Through its pharmacy membership, MHA provides a significant percentage of MedImpact's long-term care pharmacy network at issue here, including 70% of the Part D long-term care utilization. This means that MHA's member pharmacies provide 70% of the prescription medications to the Medicare Part D members residing in Care Settings whose plans are at issue here.

4. According to MHA's own public statements, MHA's member pharmacies supply 50% of all Part D long-term care prescriptions nationwide. This

means that the availability of the necessary and life-saving medications needed by members of Medicare Part D plans is largely dependent on MHA's willingness to participate in and abide by its contractual agreements with PBMs like MedImpact. MHA uses its domination in the long-term care pharmacy market to force PBMs like MedImpact to fold under MHA's demands in contract negotiations because, if they do not, vulnerable and oftentimes very ill patients will lose access to their medications. Moreover, MHA has warned MedImpact that it contractually prohibits any individual pharmacy in its membership from separately contracting with the PBMs, including MedImpact, even if the independent pharmacy is willing to agree to the terms offered by MedImpact.

5. MHA's egregious and unfair tactics present a significant danger to the ultimate beneficiaries of MedImpact's prescription drug administration services: the individuals residing in Care Settings, many of whom have coverage under Medicare Part D plans. These individuals will face significant hurdles, including the risk of, at a minimum, temporarily losing access to critical medications, if they are required to change insurers or find other in-network pharmacies that can fill their prescriptions when MHA pulls their approved pharmacies from the MedImpact network on January 1, 2025. Even a temporary loss of access to medications can easily mean significant additional medical issues, medical crises or, at worse, death, due to their severe medical conditions.

6. The hurdles faced by Medicare Part D plan members and others residing in Care Settings are significant. Typically, people who need prescription medications have multiple avenues to obtain them: they can walk or drive to a nearby pharmacy or request prescriptions be delivered to them by mail. People living in Care Settings do not have the same luxury. They are often wholly dependent on the long-term care pharmacies through PSAOs like MHA, the facilities they reside in, or family members to ensure timely delivery of their medications. Due to age, physical disability, or mental competence, many residents in Care Settings are also unable to

1  independently determine whether they need to make changes to their health plans, advocate for themselves, find a new pharmacy to obtain their medications, or physically leave and travel further distances to fill prescriptions at another in-network pharmacies.  For all of these reasons, delivery of timely, accurate prescriptions to those in Care Settings is of the utmost importance in our health system and to these Medicare Part D plan members in particular.

7. By this Complaint, MedImpact is not seeking to force MHA to honor its contractual agreements indefinitely.  Rather, MedImpact respectfully requests that this Court require MHA to honor its agreement with MedImpact through the end of its current term – December 31, 2025.  MedImpact's agreement with MHA cannot be terminated without cause until the current term ends and no other cause for termination exists.  MHA's clear intention to breach its agreement by terminating it on December 31, 2024 without cause threatens immediate and irreparable harm to MedImpact and the most vulnerable people served by MedImpact and the MHA long-term care pharmacy network.  This harm – including the potential loss of life-saving medications – cannot be remedied by mere money damages.  MedImpact is seeking relief in this Court to ensure that the most vulnerable populations served by MedImpact and its clients (plan sponsors) are not harmed while MedImpact and MHA litigate this dispute, including MHA's anticipatory breach of contract and anticompetitive practices.  MHA must be required to honor its contractual agreement through the end of the current contract term – *i.e.*, December 31, 2025.

**THE PARTIES**

8. MedImpact is a California corporation with its principal place of business located at 10181 Scripps Gateway Ct., San Diego, California 92131.

9. MHA is a Delaware corporation with its principal place of business located at 400 Interpace Parkway, Building C, Suite 200, Parsippany, New Jersey 07054.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

11. This Court has personal jurisdiction over MHA because MHA, with and through its long-term care pharmacy network, regularly conducts business in this District and in California. The claims asserted in this Complaint arise directly from Defendant's activities in this District and in California including, but not limited to, Defendant's contracts with and representation of hundreds of long-term care pharmacies in California as part of its network.

12. MHA has established substantial, systematic, and continuous contacts with this District such that Defendant expects or reasonably should expect to be hauled into court in this District. Therefore, exercise of jurisdiction by this Court is just and proper because Defendant, through its business operations, intentionally avails itself of the markets within this District and the privilege of conducting business in California.

13. Thus, Defendant has sufficient minimum contacts with this District, and this Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

14. Venue is proper in this district under 28 U.S.C. § 1391 because Defendant regularly does business in this District and is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

**A. MedImpact's Pharmacy Network**

15. MedImpact is a privately held PBM based in San Diego, California. It administers prescription drug benefits for its clients and health benefit plan sponsors, including commercial plans (e.g., managed care plans, self-insured government plans, and self-insured employer groups), Medicaid programs, and Medicare Part D

plans, throughout the United States and in the state of California (generally referred to as "Plan Sponsors").  As part of its service to its clients, MedImpact works with pharmacies to provide prescription medications to members at a discounted rate.

16. MedImpact works to make prescription drug benefits understandable and accessible to people whose health benefit plans are administered by MedImpact's clients.  MedImpact provides pharmacy benefit management services to approximately 20 million members in the United States, of which nearly one million are Medicare Part D members comprising the most at-risk patients in our population.

17. MedImpact contracts with Plan Sponsors to administer their pharmacy benefits by providing pharmacy benefit management services, which include, among other services, providing a contracted pharmacy network that provides the members of Plan Sponsors with access to pharmacies for fulfillment of their prescription medications.

18. Plan Sponsors are typically required under various federal and state laws to provide their members with adequate access to pharmacies.  Plan Sponsors often meet that requirement through contracts with PBMs like MedImpact.

19. Pharmacies may also utilize an intermediary referred to as a PSAO to contract with PBMs on their behalf for participation in PBM pharmacy networks.

20. Consequently, MedImpact contracts with pharmacies or PSAOs to provide pharmacy services to the members of the Plan Sponsors which it serves, including pharmacies that provide services to members that reside in Care Settings.

**B. MHA's Network Pharmacies**

21. MHA is a PSAO that contracts with approximately 1,600 long-term care pharmacies located throughout the United States, including over 130 pharmacies in California, of which approximately 10 are in San Diego.

22. In its role as a PSAO, MHA provides services to its contracted pharmacies ("MHA Network Pharmacies"), including, but not limited to, negotiating contracts with PBMs such as MedImpact on behalf of the MHA Network Pharmacies.

MHA, as a PSAO, operates as an intermediary between MedImpact and the MHA Network Pharmacies.

23. Long-term care pharmacies, such as those that comprise the MHA Network Pharmacies, play a unique role in the national healthcare delivery system, working alongside numerous other providers to deliver care to patients who require long-term care services.

24. Long-term care pharmacies provide coordinated and integrated care for residents in Care Settings. Individuals in Care Settings, and those the long-term care pharmacies specialize in treating, are often seniors and younger adults with debilitating disabilities and diseases who require long-term services and support, and continuous medical care. The typical patient in a Care Setting has multiple chronic conditions and relies heavily on multiple prescription medications.

25. Long-term care pharmacies, like the MHA Network Pharmacies, are specially equipped to treat these extremely fragile and often ailing patients through specialized medication management protocols and coordination of care with the patient's physicians and medical team. Long-term care pharmacies provide essential prescription medications, medication therapy management, and other consultative services to these vulnerable populations.

**C. The Pharmacy Network Participation Agreement**

26. MedImpact holds two separate pharmacy network participation agreements with MHA. Only one agreement is at issue here: a Participating Pharmacy Services Agreement (the "Elixir Agreement"), which MedImpact obtained from another PBM entity, Elixir Rx Solutions, LLC fka Rx Options, Inc. ("Elixir"), as an asset in an acquisition. MedImpact did not acquire the Elixir entity; rather, it only acquired certain assets, including the Elixir Agreement.

27. MHA entered into the Elixir Agreement on April 13, 2005. Elixir, like MedImpact, was a PBM which administered prescription drug benefits for its clients' health benefit plans, including Medicare Part D plans, across the United States. In

2015, Elixir was acquired by Rite Aid Corporation.

28. In 2007, MHA and Elixir entered the Participating Pharmacy Addendum A relating to Elixir's Medicare Part D business.

29. Effective October 1, 2012, MHA and Elixir entered into a First Amendment to Participating MHA Services Agreement ("First Amendment to the Elixir Agreement").

30. The First Amendment to the Elixir Agreement amended Section 8 of the Elixir Agreement relating to reimbursement pricing. Pursuant to the First Amendment and effective January 1, 2014, the reimbursement rates for all generic prescription drugs dispensed to all members of prescription drug plans administered by Elixir, including all Medicare Part D plans, was set based on Elixir's Maximum Allowable Cost ("MAC") list price plus a standard dispensing fee.

31. MAC is the maximum allowable reimbursement paid to a pharmacy for a particular generic drug. A PBM regularly calculates its MAC price based on industry-available data which demonstrates the average cost for drug products in the market. The resulting MAC price for a given generic drug product thus is established using the estimated market price while balancing the contractual requirements established by each unique pharmacy and client contract. Each PBM develops and maintains its own confidential MAC lists derived from its specific proprietary methodologies, and such pricing can often fluctuate based on changes in the dynamic prescription drug market.

32. On January 1, 2016, MHA and Elixir entered into a Second Amendment to Participating MHA Services Agreement ("Second Amendment to the Elixir Agreement") which further amended Section 8 of the Elixir Agreement but only for prescription drugs dispensed to Medicare Part D plan members of one of Elixir's clients, Envision Insurance Company, Inc. nka Elixir Insurance Company ("EIC"). On or about December 31, 2023, EIC ceased sponsoring Medicare Part D plans.

33. Pursuant to the Second Amendment to the Elixir Agreement, the

reimbursement rate for all generic prescription drugs dispensed to members of EIC Medicare Part D plans – as opposed to prescription drugs dispensed to members of all other Medicare Part D plans administered by Elixir – was set based on a Generic Effective Rate ("GER") formula plus a standard dispensing fee.

34. Beginning in 2016 and continuing through the date MedImpact acquired the Elixir Agreement, Elixir reimbursed MHA member pharmacies for all generic prescription drugs dispensed to members of *EIC Medicare Part D plans* (to the extent there were any such claims) at the Generic Effective Rate as provided for in the Second Amendment to the Elixir Agreement. Throughout this same period, Elixir reimbursed MHA Network Pharmacies for all generic prescription drugs dispensed to members of *all other Medicare Part D plans* at Elixir's MAC list price as provided for in the First Amendment to the Elixir Agreement.

35. In October 2023, Rite Aid Corporation and certain of its affiliates, including Elixir Rx Solutions, LLC (collectively, "Rite Aid"), filed for Chapter 11 protection in the United States Bankruptcy Court for the District of New Jersey, Case No. 23-18993 (MBK) ("Bankruptcy Proceedings").

36. On February 1, 2024, through the Bankruptcy Proceedings, Rite Aid sold certain of its assets, including certain assets of Elixir to MedImpact. When MedImpact acquired the Elixir Agreement, it became a party to the Elixir Agreement.

37. Following MedImpact's acquisition of the Elixir Agreement, MedImpact continued to reimburse MHA Network Pharmacies for all generic drug claims dispensed to all *EIC Medicare Part D plans* (to the extent there were any) at the Generic Effective Rate as provided for in the Second Amendment to the Elixir Agreement. Throughout this same period, MedImpact reimbursed MHA Network Pharmacies for all generic prescription drugs dispensed to members of *all other Medicare Part D plans* at the MAC list price. The MHA Network Pharmacies accepted reimbursement payments from MedImpact beginning in February 2024 and continuing as of the date this Complaint is filed.

38. In October 2024, MHA demanded that MedImpact pay MHA more than $7.2 million for Elixir's alleged underpayment to MHA under the Elixir Agreement from January 1, 2023 through January 31, 2024 ("Alleged Elixir Obligations") which MHA claims were assumed by MedImpact at the time of assignment and assumption of the Elixir Agreement out of the Rite Aid Bankruptcy Proceedings. MedImpact did not assume the Alleged Elixir Obligations. The Alleged Elixir Obligations were never identified by MHA or Rite Aid as a liability of Rite Aid or its affiliate Elixir in the Rite Aid Bankruptcy Proceedings, it was never contemplated by the Bankruptcy Court, and was not part of the liabilities assumed by MedImpact at the time of its asset acquisition from the Rite Aid Bankruptcy Proceedings.

39. Despite being informed that MedImpact was not a party to the Elixir Agreement prior to February 2024 and did not assume the Alleged Elixir Obligations when it purchased certain assets through the Bankruptcy Proceedings, MHA has continued its baseless demands for reimbursements under the Elixir Agreement.

40. In addition, MHA has continued to demand an estimated additional $24,099,903 for claims submitted from February 1, 2024 to December 31, 2024, over and above the reimbursements already paid by MedImpact pursuant to the Elixir Agreement. MHA claims that *all claims* should have been reimbursed pursuant to the Second Amendment to the Elixir Agreement. However, only *EIC Medicare Part D plans* are subject to the reimbursement rates set forth in the Second Amendment to the Elixir Agreement. MedImpact has properly reimbursed MHA pursuant to the relevant contractual terms – either the First Amendment to the Elixir Agreement for non-EIC claims or the Second Amendment to the Elixir Agreement for EIC claims – for all claims submitted in 2024.

41. On top of these unjustified payments for claims submitted in 2023 and 2024, MHA has also demanded new, increased reimbursement terms for 2025 onward, despite the fact that the reimbursement terms in the Elixir Agreement have already been set through December 31, 2025.

42. When MedImpact did not concede to MHA's attempt to wrest millions of dollars MedImpact does not owe, MHA threatened to terminate the Elixir Agreement, blocking MedImpact from any ability to contract with over 1,600 long-term care pharmacies (which currently supply at least 50% of all Part D long-term care prescriptions nationwide).

43. On August 15, 2024, MHA served a purported Notice of Termination of the two separate pharmacy agreements with MedImpact including the Elixir Agreement, confirming MHA's intention to terminate the agreements "short of full payment" of the amounts demanded by MHA including over $24 million under the Elixir Agreement. MHA's practice of threatening termination absent complete capitulation of their demands is not a new practice. MHA deployed these same end-of-year threats of termination for other contracts it has with MedImpact in 2015, 2017, and 2019 leaving little time for fair negotiations between the parties before the end of the year.

44. However, MHA's purported notice of termination is invalid. The current term of the Elixir Agreement extends through December 31, 2025. MHA has the right to terminate the Elixir Agreement before that date only for breach by MedImpact (and after giving MedImpact the opportunity to cure any alleged breach). MHA's sole allegation of breach is that Elixir historically paid all claims submitted by MHA Network Pharmacies pursuant to the Second Amendment of the Elixir Agreement and, at some point, changed that practice. MHA is wrong. No such breach has occurred. In attempting to terminate the Elixir Agreement without cause, MHA is anticipatorily breaching the terms of the Elixir Agreement. MHA's intent to terminate the Elixir Agreement on January 1, 2025 also violates the federal No Surprises Act and various state statutes by failing to provide continuity of care during the required period which will allow patients to make arrangements to obtain their medications through a change in their health plan or through a new long-term care pharmacy.

45. MHA is clearly aware of its domination in the market which effectively forces PBMs to concede to MHA's arbitrary and baseless demands. Indeed, after serving the notice of termination, MHA affirmatively contacted CMS – which oversees Medicare Part D plans – to inform CMS that beginning January 1, 2025, MedImpact would not be able to provide an adequate pharmacy network for its Medicare Part D Plan Sponsor clients. Under 42 C.F.R. § 423.120(a)(5), Medicare Part D Plan Sponsors must provide convenient access to long-term care pharmacies so that their members have the requisite access to covered medications under such Medicare Part D plans.

46. On information and belief, chose to reach out to CMS to impose additional pressure on MedImpact to meet MHA's demands to avoid the potential consequences if CMS believes that MedImpact's clients are no longer in compliance with 42 C.F.R. § 423.120 because of the improper anticipatory termination of the Elixir Agreement. The consequences and harm MedImpact could face include fines or penalties, loss of contracts with MedImpact's clients, and complaints or lawsuits by individuals living in Care Settings who are no longer able to obtain their prescription medications as required by law.

**D. MHA's Unfair and Anti-Competitive Practices**

47. MHA represents the largest group of long-term care pharmacies in the nation, accounting for approximately half of all prescriptions dispensed to Medicare Part D beneficiaries in post-acute and/or Care Settings in the United States. In other words, MHA's network of approximately 1,600 long-term care pharmacies supplies approximately fifty percent of all Part D long-term care prescriptions delivered to the nation's most vulnerable, sickest, and elderly patients.

48. MHA also provides particularly high proportions of the long-term care pharmacy services for Medicare Part D beneficiaries in certain geographic areas, such as Alaska (where it services approximately 70% of the State's long-term care population), Kentucky (where it treats approximately 68% of the State's long-term

care population), and Missouri (where it services approximately 55% of the State's long-term care population).

49. MHA has such a firm grasp on the market of long-term care pharmacies that contracts with MHA are critical for PBMs and their plan sponsor clients to comply with federal access requirements and to adequately serve plan members.

50. MHA publicly and stridently uses its hefty share of the long-term care pharmacy market to coerce MedImpact to bow to MHA's demands, pay more than MedImpact is contractually obligated to pay, and extract reimbursement rates that are significantly higher than market rates. Failure to acquiesce to MHA's demands will result in the improper termination of the Elixir Agreement and will cause irreparable and unnecessary harm to the vulnerable people in Care Settings who are entirely dependent on MHA long-term care pharmacies to obtain their prescriptions.

51. MHA is simply dissatisfied with the reimbursement terms it agreed to previously and is wielding its significant weight and power in the long-term care pharmacy market to unlawfully and unfairly force MedImpact to meet its demands – all at the untenable expense of the vulnerable people living in Care Settings.

**E. MHA's Unfair and Unlawful Conduct Will Irreparably Harm Residents in Long-Term Care Facilities**

52. MHA's premature purported termination of the Elixir Agreement will cause irreparable injury to some of the most vulnerable people, particularly elderly and seriously ill individuals residing in Care Settings.

53. The improper termination of the Elixir Agreements will leave thousands of people with no or limited opportunities to obtain necessary medications through their Medicare Part D plan, posing a significant risk to their health and well-being.

54. MHA's failure to comply with its contractual obligations, failure to act in good faith, and unfair and anticompetitive conduct has caused significant harm to MedImpact's business and reputation with clients and/or regulators and, if MHA moves forward with improperly terminating its contracts on January 1, 2025, MHA

will also cause irreparable harm to the most vulnerable of the public.

## COUNT I

## DECLARATORY RELIEF – THE ELIXIR AGREEMENT

55. Plaintiff incorporates by reference all preceding paragraphs.

56. An actual controversy exists between Plaintiff and Defendant regarding the validity of Defendant's unilateral termination notice and whether the Elixir Agreement can be terminated before December 31, 2025.

57. There has been no breach of contract and therefore the purported termination by Defendant of the Elixir Agreement is invalid and unenforceable.

58. Beginning February 1, 2024, when MedImpact acquired certain assets from the Rite Aid Bankruptcy Proceedings, including the Elixir Agreement, it properly reimbursed claims by MHA pursuant to the applicable reimbursement methodologies identified in the contract and its amendments.

59. MedImpact is entitled to a declaration that:
   a. MHA has unlawfully repudiated the Elixir Agreement by unilaterally declaring that the Elixir Agreement will terminate on December 31, 2024.
   b. MHA's notice of termination is invalid.
   c. There has been no cause for termination under the terms of the Elixir Agreement.
   d. MedImpact properly reimbursed claims submitted by MHA throughout 2024 pursuant to the Elixir Agreement.
   e. The contract remains in effect until December 31, 2025.

## COUNT II

## BREACH OF CONTRACT

## (ELIXIR AGREEMENT – SPECIFIC PERFORMANCE)

60. Plaintiff incorporates by reference all preceding paragraphs.

61. The Elixir Agreement between Plaintiff and Defendant includes a

provision allowing for termination only for cause, with an opportunity to cure after a notice of breach.

62. Defendant's unilateral declaration of termination of the Elixir Agreement as of December 31, 2024, constitutes a breach of contract as there has been no breach on the part of Plaintiff, and therefore, no cause for termination exists.

63. As a direct and proximate result of Defendant's breach, Plaintiff has suffered and will continue to suffer damages, including loss of business, damage to reputation, and loss of anticipated revenue from its clients.

64. Plaintiff seeks specific performance of the Elixir Agreement, requiring Defendant to continue under the terms of the Elixir Agreement at least through and including December 31, 2025.

65. Plaintiff has no adequate remedy at law to address the potential irreparable harm that would result from the termination of the Elixir Agreement, especially given the vulnerable populations that depend on the timely provision of critical medications.

66. In addition, Defendant's untimely and improper termination of the Elixir Agreement will cause irreparable injury to some of the most vulnerable members of the population, particularly elderly and seriously ill individuals residing in nursing homes and long-term care facilities.

67. Plaintiff requests injunctive relief to compel Defendant to perform its obligations under the Elixir Agreement and to refrain from taking any actions that would terminate the Elixir Agreement before December 31, 2025.

## COUNT III

**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

68. Plaintiff incorporates by reference all preceding paragraphs.

69. Implied in every contract is a covenant of good faith and fair dealing. Plaintiff is informed and believes on the facts provided herein that MHA materially and substantially breached its implied covenant of good faith and fair dealing by

exercising the discretion afforded to it under the Elixir Agreement in an arbitrary or irrational manner, for an illegitimate purpose, and/or exercising its contractual rights and obligations malevolently for its own personal gain and at Plaintiff's expense.

70. By doing so, Defendant did not act fairly and in good faith.

71. As a result of Defendant's breach, Plaintiff has suffered general damages which flow directly from and are the natural and probable consequences of Defendant's breach.

72. As a result of Defendant's breach, Plaintiff has sustained monetary and reputational damage.

73. These damages were foreseeable and within the contemplation of the parties before or at the time the contract was made.

## COUNT IV

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

74. Plaintiff incorporates by reference all preceding paragraphs.

75. During all relevant times of the relationship between Plaintiff and Defendant, Plaintiff had contracts with numerous client Plan Sponsors, which contracts were valid and enforceable, and Defendant had knowledge of these contracts.

76. On multiple dates throughout 2024, Defendant intentionally disrupted these contractual relationships by directly contacting MedImpact's clients regarding issues with reimbursement rates, alleged underpayments, and the likelihood that MHA's long-term care pharmacies will no longer be available to Plan Sponsor members as of January 1, 2025, placing MedImpact's contractual relationships with Plan Sponsors at risk.

77. Certain of MedImpact's clients which were contacted by MHA, have expressed their serious concerns about MHA's communications and whether MedImpact will be able to meet its contractual and legal obligations moving forward.

78. Defendant knew that interference with the contractual relationships

between Plaintiff and numerous Plan Sponsors was certain or substantially certain to occur as a result of Defendant's wrongful conduct.

79. Defendant's interference was a substantial factor in causing Plaintiff to suffer economic damages including but not limited to loss of profits and future profits, expenses, and other financial and reputational damages.

80. Additionally, Plaintiff is entitled to punitive damages as a result of Defendant's conduct.

81. Specifically, Defendant's actions were committed with malice and/or fraud in that Defendant's conduct was reprehensible and premeditated with the intent to cause substantial harm to Plaintiff solely to Defendant's benefit.

## COUNT V

## VIOLATION OF UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

82. Plaintiff incorporates by reference all preceding paragraphs.

83. By the facts alleged above, MHA has engaged in unfair competition within the meaning of California Business & Professional Code § 17200 et seq., (the "Unfair Competition Law" or "UCL"), which prohibits "unlawful, unfair or fraudulent" business acts and practices.

84. MHA's conduct poses a substantial risk that extremely vulnerable people will not have access to necessary and often life-saving prescription medications beginning on January 1, 2025, including those elderly and disabled people who have Medicare Part D plans and are wholly dependent on their family members or the facilities in which they reside.

85. By breaching the Elixir Agreement and terminating members' access to their prescription medications effective January 1, 2025, MHA is also violating the federal No Suprises Act, as well as state continuity of care statutes and regulations which require MHA to provide Medicare Part D plan members and members of other health plans continued care in the event of a contract termination.

86. In addition to violating the federal No Suprises Act, and state continuity of care statutes and regulations, which directly harms the most vulnerable of Americans, MHA's conduct also significantly threatens or harms competition in the market for provision of prescription medications in Care Settings.

87. MHA has contracted with more than 50% of the long-term pharmacies across the country. On information and belief, as part of its contracts, MHA prohibits long-term care pharmacies from contracting with MedImpact and other PBMs directly by requiring member pharmacies to agree to an exclusivity clause with MHA.

88. MHA is thus refusing to contract with MedImpact and then separately prohibits willing long-term care pharmacies in MHA's network from contracting with MedImpact directly. This strategy is unfair and poses a significant threat to market competition where MHA uses its significant share of the long-term care pharmacy market to block MedImpact from contracting with long-term pharmacies that are otherwise willing to agree to MedImpact's contractual terms.

89. It is also unfair and unlawful for MHA to falsely inform CMS and MedImpact's clients that MedImpact will not be able to maintain an adequate network and is in violation of its contract with MHA with respect to its reimbursement methodologies in order to steer clients away from MedImpact, thwarting fair market competition for the sole purpose of increasing MHA's profits. MHA's actions have harmed and are continuing to harm competition and consumers, have caused substantial reputational and financial injury to MedImpact, and continue to do so.

90. MHA's false statements about MedImpact continue to injure MedImpact. MHA's anticipatory breach of the Elixir Agreement is designed to harm consumers who ultimately rely on MedImpact's PBM services as well as MedImpact's clients who, before the fraudulent statements were published, had no reason to believe that MedImpact may not be able to continue to comply with its

contractual and regulatory obligations.

91.  MHA's unlawful, unfair, and fraudulent business acts and practices are the cause of direct and proximate injury to MedImpact and vulnerable members of the public. MedImpact has suffered harm in all 50 states and Puerto Rico, where customers of Defendant and Plaintiff reside. MHA's conduct also threatens immediate and irreparable harm to the public in all 50 states, particularly those most vulnerable of our population who rely upon the timely provision of medications under MedImpact's contractual relationships with MHA Network Pharmacies and have no viable or easily obtainable alternative.

92.  MedImpact – and the vulnerable public impacted by MHA's unlawful termination of the Elixir Agreement – have no adequate remedy at law for the foregoing wrongful conduct.

93.  Plaintiff seeks an order requiring Defendant to continue the status quo under the terms of the Elixir Agreement until December 31, 2025 to allow the parties to litigate this dispute.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as follows:

1. Compensatory damages in an amount to be determined at trial;

2. A declaratory judgment affirming that MedImpact has not breached the Elixir Agreement;

3. An order for specific performance requiring Defendant to fulfill its contractual obligations under the Elixir Agreement;

4. An injunction preventing Defendant from terminating the Elixir Agreement in violation of the terms of the agreement;

5. Punitive damages for Defendant's intentional and wrongful conduct;

6. Costs of suit and reasonable attorneys' fees; and

7. Such other and further relief as the Court deems just and proper.

Dated: December 30, 2024         COOLEY LLP

By: */s/ Mazda K. Antia*
      Mazda K. Antia

Attorneys for Plaintiff
MedImpact Healthcare Systems, Inc.