COOLEY LLP
MAZDA K. ANTIA (214963)
(mantia@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:  +1 858 550 6000
Facsimile:   +1 858 550-6420

JAMIE D. ROBERTSON (326003)
(jdrobertson@cooley.com)
110 N. Wacker Dr. suite 4200
Chicago, Illinois 60606-1511
Telephone:  +1 312 881-6598
Facsimile:   +1 312 881-6500

Attorneys

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MHA LONG-TERM CARE NETWORK, INC. and DOES 1-10, inclusive, <br><br> Defendants. | Case No. 24-cv-2482-DMS-VET <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> Date: <br> Judge:    Hon. Dana M. Sabraw |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................ 2

    A.    MedImpact Must Ensure Convenient Access to Prescription Drug Services for Residents in Care Settings. .................................... 2

    B.    MedImpact's Acquisition of the Elixir Agreement and Reimbursements to MHA's Pharmacies. .......................................... 4

    C.    MHA Improperly Attempts To Terminate the Elixir Agreement ........ 6

    D.    MHA's Tortious Interference with MedImpact's Contractual Relationships. ................................................................................ 7

    E.    MedImpact's Attempts to Resolve MHA's Alleged Dispute. ............. 8

III.  MEDIMPACT IS ENTITLED TO A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTIVE RELIEF .................................. 8

    A.    MedImpact is Likely to Succeed on the Merits of its Contract Claims. .......................................................................................... 9

    B.    MedImpact Will Suffer Immediate Irreparable Harm Absent a Preliminary Injunction ................................................................. 13

    C.    The Balance of Equities Tips Strongly In MedImpact's Favor .......... 17

    D.    A Preliminary Injunction Serves the Public Interest ......................... 18

    E.    No Bond Should be Required Because Defendants Will Not Sustain Any Damages from the Proposed Preliminary Injunctive Relief. ............................................................................................ 19

IV.   CONCLUSION .................................................................................. 20

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Air Canada and Aeroplan Inc. v. Localhost LLC*,

5
  2024 WL 1251286 (D. Del. 2024) ..................................................... 10

6

*All. For Wild Rockies v. Cottrell*,

7
  632 F.3d 1127 (9th Cir. 2011) ............................................................. 9

8

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,

9
  750 F.2d 1470 (9th Cir. 1985) ........................................................... 16

10

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) *aff'd* 658 F.3d 1150 (9th Cir.

11
  2011) ................................................................................................... 17

12

*Bionpharma Inc. v. CoreRx, Inc.*,

13
  582 F.Supp.3d 167 (S.D.N.Y. 2022) ......................................... 15, 16

14

*Disney Enters., Inc. v. VidAngel, Inc.*,

15
  869 F.3d 848 (9th Cir. 2017) ............................................................. 10

16

*East Bay Sanctuary Covenant v. Barr*,

17
  934 F.3d 1026 (9th Cir. 2019) ........................................................... 18

18

*Edwards Lifesciences Corp. v. Launey*,

19
  2023 WL 4680774 (C.D. Cal. June 12, 2023) .................................. 10

20

*EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt. Co.*,

21
  2012 WL 5990113 (C.D. Cal. Nov. 30, 2012) .................................. 13

22

*Facebook, Inc. v. BrandTotal Ltd.*,
  499 F. Supp. 3d 720 (N.D. Cal. 2020) ................................................ 9

23

*Flex-Plan Servs., Inc v. Evolution1, Inc.*,

24
  2013 WL 12092543 (W.D. Wash. Dec. 31, 2013) ...................... 13, 19

25

*Gorbach v. Reno*,

26
  219 F.3d 1087 (9th Cir. 2000) ........................................................... 20

27

*Hammer v. Howard*,

28
  2021 WL 4935019 (Del. Super. Ct. Oct. 22, 2021) .......................... 12

Cooley LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Harris v. Bd. of Supervisors*,
366 F.3d 754 (9th Cir. 2004) .................................................................. 14

*Herb Reed Enterprises, LLC v. Florida Ent. Mgmt.*,
736 F.3d 1239 (9th Cir. 2013) ................................................................ 16

*Humana Ins. Co. v. Tenet Health Sys.*,
2016 WL 5815907 (E.D. Cal. Oct. 4, 2016) ........................................... 17

*Ikhana Grp., LLC v. Viking Air Ltd.*,
2023 WL 7348411 (S.D. Cal. Nov. 7, 2023) ........................................... 20

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ................................................................ 20

*Jones v. H.S.B.C. (USA)*,
844 F. Supp. 2d 1099 (S.D. Cal. 2012) .................................................... 9

*League of Wilderness Defenders/Blue Mountains Biodiversity Project
v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ............................................................ 18, 19

*Novotech (Austl.) Pty Ltd. v. SureClinical Inc.*,
2022 WL 17419168 (E.D. Cal. Dec. 5, 2022) .............................. 15, 17, 19

*Nutramax Lab'ys, Inc. v. Body Wise Int'l, Inc.*,
2019 WL 3210095 (C.D. Cal. Apr. 10, 2019) ......................................... 16

*Price v. City of Stockton*,
390 F.3d 1105 (9th Cir. 2004) ................................................................ 18

*Progressive Democrats for Soc. Just. v. Bonta*,
2021 WL 6496784 (N.D. Cal. July 16, 2021) ......................................... 18

*QC Mfg., Inc. v. Solatube Int'l, Inc.*,
2021 WL 4963380 (C.D. Cal. Sept. 10, 2021) ........................................ 18

*R.D. Arnold Const. v. Dutt*,
2001 WL 1555548 (Del. Com. Pl. Mar. 28, 2001) .................................. 12

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) ............................................................. 9, 13

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

**MPA ISO PL'S. *EX PARTE*
Appl for TRO**

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rodde v. Bonta*,
    357 F.3d 988 (9th Cir. 2003) ............................................................................... 14

*Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*,
    535 F. Supp. 3d 548 (S.D.W. Va. 2021) ........................................................... 13

*SPI Pharma, Inc. v. Roben Mfg. Co. Inc.*,
    2023 WL 4197181 (D.N.J. June 27, 2023) ...................................................... 12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ............................................................................... 17

*Synopsys, Inc. v. InnoGrit, Corp.*,
    2019 WL 2617091 (N.D. Cal. June 26, 2019) ................................................ 17

*Textile Unlimited, Inc. v. A.BMH Co., Inc.*,
    240 F.3d 781 (9th Cir. 2001) ................................................................................. 9

*UbiquiTel Inc. v. Sprint Corp.*,
    2005 WL 3533697 (Del. Ch. Dec. 14, 2005) ................................................. 12

*United States v. Idaho*,
    623 F. Supp. 3d 1096 (D. Idaho 2022) .............................................................. 14

*Wells v. Lee Builders, Inc.*,
    34 Del. Ch. 107 (1953) .......................................................................................... 12

*Winter v. Nat'l Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................... 9

**Other Authorities**

42 C.F.R. § 423.120(a)(5) .......................................................................................... 3

Fed. R. Civ. P.
    65 ................................................................................................................... 9, 19

## I.    INTRODUCTION

Vulnerable individuals who, because of their advanced age, physical, or medical condition, and reside in long-term care facilities, skilled nursing facilities, assisted living facilities, or nursing homes (collectively, "Care Settings") disproportionately depend on the health care system to ensure they have access to their prescription medications.  Unlike other members of the public who can drive to a pharmacy, residents of Care Settings – residents who, as relevant to this motion, are enrolled in Medicare plans – face significant hurdles if they are faced with changes in their health care plan or prescription drug coverage requiring them to change benefit plans or find ways to access their medications in different pharmacies. Key participants in the provision of prescription drug services to residents of Care Settings include drug manufacturers, health benefit plan sponsors and administrators, pharmacy benefit managers ("PBM") like Plaintiff MedImpact Healthcare Systems, Inc. ("MedImpact"), and specialized long-term care pharmacies or groups of long-term care pharmacies like Defendant MHA Long-Term Care Network, Inc. ("MHA").  Each of these entities plays a critical role in ensuring that the nation's most vulnerable individuals can access their life-saving medications.

MHA – which controls more than 50% of the specialized long-term care pharmacies in the United States that serve residents in Care Settings – is putting each of these lives at risk by using their substantial presence in the market to both threaten improper termination of its contract with MedImpact, and force MedImpact to pay exorbitant new rates and unsubstantiated reimbursements for past claims or else risk losing access to MHA's pharmacies on January 1, 2025.  Without access to MHA's pharmacy network, residents in Care Settings who depend on MedImpact for drug administration services risk losing access to their medications and will have to scramble to get permission to change their coverage so that they may continue to receive their prescriptions at their local pharmacies.  It is now the end of December, Medicare Open Enrollment is closed, and there is significant risk that the people

impacted by MHA's business tactics will not be able to find new coverage before January 1, 2025.

MedImpact seeks a narrowly tailored temporary restraining order and preliminary injunction barring MHA from unlawfully terminating its April 13, 2005 Participating Pharmacy Services Agreement ("Elixir Agreement") on January 1, 2025. MHA served a purported Notice of Termination alleging – incorrectly – that its member long-term care pharmacies have been under-paid and that they would cease providing pharmacy services after December 31, 2024. However, the Elixir Agreement cannot be terminated in this manner. As MedImpact has demonstrated to MHA, and as further detailed below, MHA's member pharmacies have been reimbursed properly according to the terms of the Elixir Agreement. Because there has been no breach of the Elixir Agreement by MedImpact, the Elixir Agreement cannot be terminated until December 31, 2025. MHA's clear Notice of Termination without cause is an anticipatory breach of the Elixir Agreement and should be enjoined by this Court to preserve the status quo between the Parties, protect vulnerable members of the public, and allow time for the Parties to adjudicate their dispute.

## II.   FACTUAL BACKGROUND

### A.   MedImpact Must Ensure Convenient Access to Prescription Drug Services for Residents in Care Settings.

Provision of prescription drug services in the United States involves numerous entities before a person can receive their medications from the pharmacy. Among the key partners in this process are drug manufacturers, health benefit plan sponsors, plan administrators, PBMs, and the individual pharmacies dispensing medications. After a Medicare-eligible individual is enrolled in a Medicare Part A or Part B plan, they can elect to enroll in a Medicare Part D plan to cover their prescription medications. Individuals can also enroll in Medicare Advantage plans that include Medicare Part D prescription drug coverage. They then select a prescription drug

plan sponsor ("Plan Sponsors") in their area that offers the prescription drug coverage they need. After the initial Medicare enrollment window when an individual turns 65 years old, a Medicare member may only change their plan during Open Enrollment unless certain qualifying events occur. In 2024, the Open Enrollment period was from October 15 – December 7. Plan Sponsors, including Medicare Part D plan sponsors, are typically required under various federal and state laws to provide their members with convenient access to pharmacies. *See, e.g.*, 42 C.F.R. § 423.120(a)(5); Declaration of Dave Halter ("Halter Decl."), ¶¶ 5-8.

Plan Sponsors who contract with MedImpact rely on MedImpact to ensure their members have access to in-network pharmacies as required by law. Halter Decl., ¶¶ 5-8. This access is especially important for residents in Care Settings who can face significant hurdles in order to obtain their prescription medications. Generally, people who need prescription medications have multiple avenues to obtain them: they can walk or drive to a nearby pharmacy or request prescriptions be delivered to them by mail. People living in Care Settings do not have the same luxury. They are often wholly dependent on specialized long-term care pharmacies, the facilities they reside in, or family members to ensure delivery of their medications. Due to age, physical disability, or mental competence, many residents in Care Settings are also unable to independently determine whether they need to make changes to their health plans, find a new pharmacy to obtain their medications, or physically leave and travel further distances to fill prescriptions at in-network pharmacies. For all of these reasons, delivery of timely, accurate prescriptions to those in Care Settings is of the utmost importance in our health system.

MedImpact, on behalf of each Plan Sponsor, ensures residents in Care Settings have adequate access to pharmacies by contracting with networks of specialized long-term care pharmacies through Pharmacy Services Administrative Organizations ("PSAO") like MHA. *Id.* Pharmacies enter into contracts with the PSAO allowing the PSAO to contract with PBMs on their behalf. Halter Decl., ¶ 7. Once the PSAO

contracts with MedImpact, these pharmacies become available, in-network pharmacies for members of benefit plans sponsored by MedImpact's clients. Halter Decl., ¶ 8.

### B.    MedImpact's Acquisition of the Elixir Agreement and Reimbursements to MHA's Pharmacies.

MedImpact holds two separate pharmacy network participation agreements with MHA.  Only one agreement is at issue here: the Elixir Agreement, which MedImpact obtained from another PBM entity, Elixir Rx Solutions, LLC fka Rx Options, Inc. ("Elixir"), as an asset in an acquisition.  Declaration of Amy Karfeld ("Karfeld Decl."), ¶ 3, Ex. A; *see also* Declaration of Jamie Robertson ("Robertson Decl."), Ex. A (filed provisionally under seal).  MHA entered into the Elixir Agreement on April 13, 2005.  *Id.*  Elixir, like MedImpact, was a PBM which administered prescription drug benefits for its clients' health benefit plans, including Medicare Part D plans, across the United States.  In 2015, Elixir was acquired by Rite Aid Corporation.  *Id.*  The Elixir Agreement is governed by Delaware law.  Karfeld Decl., Ex. A, ¶ 17.

Over time, MHA and Elixir entered into two separate amendments to the Elixir Agreement which defined how certain claims would be reimbursed.  On October 1, 2012, MHA and Elixir entered into a First Amendment to Participating MHA Services Agreement ("First Amendment to the Elixir Agreement").  Karfeld Decl., ¶ 4, Ex. B; *see also* Robertson Decl., Ex. B (filed provisionally under seal).  The First Amendment to the Elixir Agreement amended Section 8 of the Elixir Agreement relating to reimbursement pricing over time for both branded and generic drugs. Different formulas for reimbursements were set out for the period of October 1, 2012 through December 31, 2012 for both branded and generic drugs with new formulas becoming effective on January 1, 2013 and January 1, 2014.  Karfeld Decl., ¶ 5; *id.*, Ex. B.  Pursuant to the First Amendment to the Elixir Agreement, the relevant reimbursement calculation for generic prescription drugs was set based on Elixir's

1  Maximum Allowable Cost ("MAC")[1] list price plus a standard dispensing fee.  *Id.*

2  These reimbursement rates remain in effect today for the vast majority of claims

3  submitted by MHA's member pharmacies.

4      On January 1, 2016, MHA and Elixir entered into a Second Amendment to

5  Participating MHA Services Agreement ("Second Amendment to the Elixir

6  Agreement") which further amended Section 8 of the Elixir Agreement but ***only for***

7  prescription drugs dispensed to Medicare Part D plan members of Elixir's client,

8  Envision Insurance Company, Inc. nka Elixir Insurance Company ("EIC").  Karfeld

9  Decl., ¶ 7 and Ex. C; *see also* Robertson Decl. (filed provisionally under seal).

10  Pursuant to the Second Amendment to the Elixir Agreement, the reimbursement rate

11  for generic prescription drugs dispensed to members of EIC Medicare Part D plans –

12  as opposed to prescription drugs dispensed to members of all other Medicare Part D

13  plans administered by Elixir – was set was set based on a Generic Effective Rate

14  ("GER") formula plus a standard dispensing fee.  *Id.*, ¶ 8 and Ex. C.

15      From at least 2021 and continuing through the date MedImpact acquired the

16  Elixir Agreement, Elixir reimbursed MHA member pharmacies for all generic

17  prescription drugs dispensed to members of EIC Medicare Part D plans based on the

18  GER, the reimbursement rate provided for in the Second Amendment to the Elixir

19  Agreement.   Karfeld Decl., ¶¶ 13-14.   Throughout this same period, Elixir

20  reimbursed MHA pharmacies for generic prescription drugs dispensed to members

21  of all other Medicare Part D plans at Elixir's MAC list price, the reimbursement rate

22  set forth in the First Amendment to the Elixir Agreement.  *Id.*

23      In October 2023, Rite Aid Corporation and certain of its affiliates, including

[1] MAC is the maximum allowable reimbursement paid to a pharmacy for a particular generic drug.  A PBM regularly calculates its MAC price based on industry-available data which demonstrates the average cost for drug products in the market.  The resulting MAC price for a given generic drug product thus is established using the estimated market price while balancing the contractual requirements established by each unique pharmacy and client contract.  Each PBM develops and maintains its own confidential MAC lists derived from its specific proprietary methodologies, and such pricing can often fluctuate based on changes in the dynamic prescription drug market.  Karfeld Decl., ¶ 6.

Elixir (collectively, "Rite Aid"), filed for Chapter 11 protection in the United States Bankruptcy Court for the District of New Jersey, Case No. 23-18993 (MBK) ("Bankruptcy Proceedings").  Karfeld Decl., ¶ 3.  On February 1, 2024, through the Bankruptcy Proceedings, Rite Aid sold certain of its assets to MedImpact. MedImpact did not acquire the Elixir Rx Solutions, LLC entity, but only certain assets of Elixir Rx Solutions, LLC, which included the Elixir Agreement.  *Id*.  As such, MedImpact is now party to the Elixir Agreement.

Following MedImpact's acquisition of the Elixir Agreement, MedImpact has reimbursed MHA pharmacies for  generic drug claims dispensed to all EIC Medicare Part D plans based on the GER, the reimbursement rate provided for in the Second Amendment to the Elixir Agreement.  *Id.*, ¶¶ 13-14.  Throughout this same period, MedImpact has reimbursed MHA pharmacies for  generic prescription drugs dispensed to members of all other Medicare Part D plans at Elixir's MAC list price as provided in the First Amendment to the Elixir Agreement.  *Id.*

### C.    MHA Improperly Attempts To Terminate the Elixir Agreement

MHA plays a colossal role in the provision of prescription medications to vulnerable individuals residing in Care Settings across the United States.  MHA's member-pharmacies supply access to over 50% of all Part D long-term care prescriptions nationwide.  Halter Decl., ¶ 11.  Through its contracts with MedImpact specifically, MHA provides a significant percentage of MedImpact's long-term care pharmacy network, including 70% of the Medicare Part D long-term care utilization at issue here.  *Id.*  This means that MHA's member pharmacies provide 70% of all prescription medications to the Medicare Part D members residing in Care Settings and whose plans are contracted through MedImpact pursuant to the Elixir Agreement.  *Id.*

Absent a breach by either party, the Elixir Agreement cannot be terminated until December 31, 2025.  *See* Karfeld Decl., Ex. A ¶ 10.  In May 2024, MHA attempted  to lay the groundwork for its erroneous claim that MedImpact breached

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

the Elixir Agreement by underpaying MHA member pharmacies.  Specifically, MHA is demanding that MedImpact pay MHA almost $7.2 million for Elixir's alleged underpayment to MHA under the Elixir Agreement from January 1, 2023 through January 31, 2024 ("Alleged Elixir Obligations") which MHA claims were assumed by MedImpact at the time of assignment and assumption of the Elixir Agreement out of the Rite Aid Bankruptcy Proceedings.  Halter Decl., ¶ 12.  However, MedImpact did not assume any liability that may have existed prior to February 1, 2024 because MHA did not identify any such liability in the Rite Aid Bankruptcy Proceedings.  *Id.* In addition, MHA continues to demand an estimated additional $24,099,903 for claims submitted from February 1, 2024 to December 31, 2024, over and above the reimbursements already paid by MedImpact pursuant to the Elixir Agreement.  Halter Decl., ¶ 13.  MHA claims that all claims should have been reimbursed pursuant to the Second Amendment to the Elixir Agreement because that was Elixir's alleged historical practice.  Halter Decl., ¶ 14; Karfeld Decl., ¶ 11.  That is incorrect. Specifically, only EIC Medicare Part D plans are subject to the reimbursement calculation set forth in the Second Amendment to the Elixir Agreement.  Karfeld Decl., ¶¶ 8-9.  Elixir, and now MedImpact have properly reimbursed MHA pursuant to the relevant contractual terms – either under the First Amendment to the Elixir Agreement for non-EIC claims or the Second Amendment to the Elixir Agreement for EIC claims.  *Id.*, ¶¶ 13-14.

On top of these unjustified payments for claims submitted in 2023 and 2024, MHA has also demanded new terms for 2025 onward.  Halter Decl., ¶ 15.  When MedImpact did not concede to MHA's unsupported attempt to extract millions of dollars MedImpact does not owe, on August 15, 2024, MHA sent a Notice of Termination of the Elixir Agreement.  *Id.*, Ex. A.

**D.    MHA's Tortious Interference with MedImpact's Contractual Relationships.**

In addition to terminating the Elixir Agreement, MHA has and continues to

use its substantial position in the health care market to interfere with MedImpact's contractual relationships with its clients and regulators. For example, on December 6, 2024, MedImpact learned from its Client, American Health Partners that MHA-member pharmacies were advising American Health Partners' members that there was no contract between MedImpact and MHA and that the members should "disenroll" from American Health Partners' benefit plans. Halter Decl., ¶ 17. The uncertainty caused by MHA's and their members' tactics has already caused irreparable damage to MedImpact's reputation with its Clients who have expressed concerns about MedImpact's ability to meet its contractual obligations. *Id.* Similarly, MHA made similar misstatements to CMS, causing MedImpact to have to defend its viability as a business to its regulator. *Id.*

### E. MedImpact's Attempts to Resolve MHA's Alleged Dispute.

MedImpact has been actively engaged in seeking resolution of MHA's alleged dispute since receiving the Notice of Termination on August 15, 2024. Halter Decl., ¶ 18. The Parties have engaged in formal mediation with a well-respected former judge and numerous post-mediation discussions. *Id.* However, despite MedImpact's best efforts to resolve the issues through mediation and negotiation – which culminated on or about December 30 2024 – the parties were unable to reach a resolution. *Id.* Thus, when it became apparent that no deal would be reached, MedImpact was forced to resort to this Court for relief.

### III. MEDIMPACT IS ENTITLED TO A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTIVE RELIEF

A temporary restraining order ("TRO") may be issued upon a showing that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). "The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held." *Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012); *see also Premier Produce Co., Inc. v.*

*Martinez*, 2023 WL 3568068, at *1 (S.D. Cal. 2023) ("The purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment.").

In the Ninth Circuit, the legal standards for a TRO and a preliminary injunction are "substantially identical." *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020). The basic function of a preliminary injunction is to "preserv[e] the status quo" until trial and to "prevent[] the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A.BMH Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001). To obtain either form of injunctive relief, a plaintiff must establish: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the requested injunction is in the public interest. *Winter v. Nat'l Res. Defense Council, Inc.,* 555 U.S. 7, 20 (2008) (citations omitted). A party seeking a preliminary injunction must meet one of two variants of the same standard: either she must demonstrate each of the four elements (*id.*) or, alternatively, using a "sliding scale" approach, "serious questions" going to the merits of the case are sufficient (a lesser showing than likelihood of success on the merits) if the balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are satisfied. *All. For Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). "Serious questions" under the alternate approach constitutes "questions which cannot be resolved one way or the other at the hearing on the injunction," but which suggest that the petitioner has a "fair chance" of prevailing. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

### A.    MedImpact is Likely to Succeed on the Merits of its Contract Claims.

MedImpact's Complaint comfortably establishes that it is likely to succeed on the merits of its contract claim. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848,

856 (9th Cir. 2017); *Edwards Lifesciences Corp. v. Launey*, 2023 WL 4680774, at n. 2 (C.D. Cal. June 12, 2023) (Where a party alleges multiple claims, it "need only show likelihood of success on one claim to justify injunctive relief"). "The elements of a breach of contract claim under Delaware law are: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) resulting damage to the plaintiff." *Air Canada and Aeroplan Inc. v. Localhost LLC*, 2024 WL 1251286, at *3 (D. Del. 2024). Each of these elements are met. First, there can be no dispute that the Parties have a valid contract - MHA's member pharmacies have been submitting claims to MedImpact and accepting reimbursement payments from MedImpact since MedImpact acquired the Elixir Agreement in February 2024. Halter Decl., ¶ 10.

Second, MHA has unequivocally confirmed it intends to breach the Elixir Agreement on January 1, 2025. Halter Decl., Ex. A. By its terms, the Elixir Agreement cannot be terminated without cause until December 31, 2025. Karfeld Decl., Ex. A, ¶ 10. MHA's only avenue for termination prior to that date is to establish that MedImpact breached the Elixir Agreement giving it the right to terminate on thirty days written notice and after giving MedImpact the opportunity to cure any breach. *Id.* No such breach has occurred.

MedImpact has established that it has not breached the Elixir Agreement as MHA alleges. *Id.*, ¶¶ 13-14. In its Notice of Termination, MHA alleges only one supposed breach of the Elixir Agreement by MedImpact: that Elixir historically reimbursed *all claims* submitted by MHA-member pharmacies for generic drugs pursuant to the Second Amendment to the Elixir Agreement until in or about October 2023 when Elixir, and later MedImpact, began reimbursing claims with a different formula that led to lower reimbursements. Halter Decl., Ex. A; Karfeld Decl., ¶ 11.

MHA is wrong. Indeed, as MedImpact has repeatedly communicated to MHA MHA, its member pharmacies were properly reimbursed pursuant to the First and Second Amendments, respectively.

How claims are paid under the Elixir Agreement depends on multiple factors: (1) the specific Plan Sponsor; (2) when the claim was submitted; and (3) whether the drug was branded or generic. During the relevant time period, claims submitted by MHA on behalf of their member pharmacies were paid as follows:

| *Claims submitted for members of EIC sponsored plans* | |
| --- | --- |
| Branded prescription drugs | GER – negotiated discount + standard dispensing fee |
| Generic Prescription drugs | GER – negotiated discount + standard dispensing fee |
| *Claims submitted for members of non-EIC sponsored plans* | |
| Branded prescription drugs | GER - negotiated discount + standard dispensing fee |
| Generic Prescription drugs | MAC list price plus standard dispensing fee |

Karfeld Decl., Exs. A - C.

Based on MedImpact's post-payment review, Elixir, and later MedImpact, have properly reimbursed claims to MHA's member pharmacies. *Id.*, ¶¶ 13-14.[2] MedImpact's analysis establishes that since 2021, claims submitted for members of EIC-sponsored plans were reimbursed pursuant to the methodology set out in the Second Amendment to the Elixir Agreement and claims submitted for members of all other Medicare Part D sponsored plans were paid pursuant to the First Amendment to the Elixir Agreement. *Id.* Any change MHA have noticed in overall reimbursements in October 2023 was likely because EIC ceased sponsoring individual prescription drug plans which would have lowered the volume of prescriptions being filled at MHA-member pharmacies. *Id.*, ¶ 12. But any decrease in volume of claims does not have any bearing on whether payments were appropriately made pursuant to the Elixir Agreement as MHA has alleged. Simply put, MHA was properly reimbursed pursuant to the contractual terms of the Elixir

---

[2] During the Parties' discussions over the past several months, and in response to MHA's allegations of a change in reimbursement methodology, MedImpact re-examined payments made under the terms of the Elixir Agreement which again confirmed that payments were made in accordance with the relevant contractual terms.

Agreement.

MHA made clear in its August 15, 2024 Notice of Termination that it intends to terminate the Elixir Agreement on January 1, 2025.  Halter Decl., ¶ 15.  Because MedImpact has not committed a breach entitling MHA to terminate, this plainly constitutes an anticipatory breach of the Elixir Agreement by MHA.  *SPI Pharma, Inc. v. Roben Mfg. Co. Inc.*, 2023 WL 4197181, at *6 (D.N.J. June 27, 2023) ("Delaware courts have routinely held that an affirmative statement confirming that a party will miss an agreed upon deadline or a refusal to perform constitutes an anticipatory breach."); *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at n. 61 (Del. Ch. Dec. 14, 2005) ("[Delaware] law generally has acknowledged for more than one hundred years that an unequivocal statement by a promisor that he will not perform his promise gives the injured party an immediate claim to damages for total breach, in addition to discharging his remaining duties of performance." (internal citations omitted)); *Wells v. Lee Builders, Inc.*, 34 Del. Ch. 107, 111 (1953) (finding that "distinctly and unequivocally stat[ing] an intention not to perform their obligation . . . make[s] them guilty of anticipatory breach"); *R.D. Arnold Const. v. Dutt*, 2001 WL 1555548, at *2 (Del. Com. Pl. Mar. 28, 2001) ("A clear indication of a party's intent not to perform their obligation will make them guilty of anticipatory breach."); *Hammer v. Howard*, 2021 WL 4935019, at *5 (Del. Super. Ct. Oct. 22, 2021) ("[S]ignificant authority supports the conclusion that a repudiation coupled with simultaneous non-performance gives rise to an action for total breach . . . under the contract." (internal citations omitted)).

Finally, because MHA's repudiation and breach of the Elixir Agreement will undoubtedly cause MedImpact to lose clients and suffer damages to its business (see Section B *infra*), Plaintiff is likely to succeed on the merits of its breach of contract claim.  This factor thus weighs in favor of granting injunctive relief barring MHA from prematurely terminating the Elixir Agreement before the agreement expires on December 31, 2025, and allowing the parties to adjudicate their dispute while

maintaining the status quo.[3] *EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt. Co.*, 2012 WL 5990113, at *3 (C.D. Cal. Nov. 30, 2012) (relying on Delaware law to grant motion for preliminary injunction based upon anticipatory breach of contract claim allowing the parties to preserve the status quo pending arbitration); *see also Flex-Plan Servs., Inc v. Evolution1, Inc.*, 2013 WL 12092543, at *6 (W.D. Wash. Dec. 31, 2013) (finding that plaintiff's allegations and the "Court's reasonable reading of the contract" reflected that plaintiff was likely to prevail in proving that it did not materially breach the agreement, which was sufficient to establish that defendant anticipatorily breached the agreement by terminating); *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548 (S.D.W. Va. 2021) (granting preliminary injunctive relief would be the equivalent of granting plaintiff an award of specific performance, which under Michigan contract law "is particularly appropriate where the goods contracted for are unique or in short supply from a limited number of potential sources").

**B.    MedImpact Will Suffer Immediate Irreparable Harm Absent a Preliminary Injunction**

If MHA is permitted to illegally terminate the Elixir Agreement, it will have serious inevitable and wholly predictable consequences that will cause irreparable harm to MedImpact, the patients it serves, and the public at large, for which monetary damages, as a remedy, are inadequate. MedImpact will likely lose a substantial number of its Plan Sponsor clients and most, if not all, its long-term care business, suffer immediate damage to its reputation, brand, competitive positions, and market share, and there is a significant risk that medication to vulnerable long-term care

---

[3] At a minimum, MedImpact's internal analysis demonstrates "serious questions" as to whether it has breached the Elixir Agreement which suggest that it has a "fair chance" of prevailing on its claim. *Republic of the Philippines*, 862 F.2d at 1262. As further detailed below, in light of the significant irreparable harm to MedImpact that will result absent a preliminary injunction and the public's significant interest in requiring MHA to abide by its contractual agreements, Plaintiff's proposed preliminary injunction is warranted even if the Court determines MedImpact only has a "fair chance" of prevailing on its claims. *Id.*

1    patients could be disrupted along with other patient safety concerns.  Halter Decl.,
2    ¶¶ 19-20.

3          *First*, MHA's threatened termination will imperil vulnerable long-term care
4    patients by potentially disrupting their access to critical medications.  *Id*.  MedImpact
5    ensures that elderly Medicare Part D plan members who reside in Care Settings have
6    uninterrupted (often life-saving) access to necessary medications.  If MHA is allowed
7    to terminate the Elixir Agreement pursuant to its purported Notice of Termination on
8    January 1, 2025, these patients will need to scramble to change insurers (Plan
9    Sponsors) or find another in-network pharmacy that can fill their prescriptions.  *Id*.
10   But these patients cannot simply walk down the street to another pharmacy – their
11   age, disability, or mental competence make it difficult for them to obtain their
12   prescription medications any other way.  These individuals are wholly dependent on
13   long-term care pharmacies who provide medication through PBMs like MedImpact.
14   And even a temporary loss of access to medication as they attempt to find a new
15   pharmacy risks significant health complications and puts their safety in danger.  It is
16   well established in the Ninth Circuit that potential risks related to patient safety or
17   care constitute irreparable harm.  *See Rodde v. Bonta*, 357 F.3d 988, 993-34 (9th Cir.
18   2003) (finding irreparable harm where hospital closure would delay or prevent care
19   for disabled patients and potentially increase pain and medical complications);
20   *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding likely
21   irreparable harm to chronically ill indigent patients where hospital closure risked
22   medical complications and other health issues for patients); *United States v. Idaho,*
23   623 F. Supp. 3d 1096 (D. Idaho 2022) (noting where "patients could suffer
24   irreparable injury" if they were not granted access to abortion services, plaintiff "has
25   shown it is likely to suffer irreparable harm in the absence of an injunction");
26   *Novotech (Austl.) Pty Ltd. v. SureClinical Inc.*, 2022 WL 17419168, at *4 (E.D. Cal.
27   Dec. 5, 2022) (finding irreparable injury was established where safety of trial patients
28   was implicated by defendant's termination of contract).

*Second*, MedImpact will immediately begin to lose its Plan Sponsor clients and business if MHA is allowed to illegally terminate the Elixir Agreement because it will not be able to provide a long-term care pharmacy network. Halter Decl., ¶¶ 21-23. Once MHA unlawfully terminates the Elixir Agreement, MedImpact will lose the ability to satisfy its obligations to its clients. MedImpact will be forced to immediately seek a replacement pharmacy network to retain its clients. However, due to MHA's dominance over specialized long-term care pharmacies nationwide, finding a network to replace MHA's pharmacies will take significant time. Halter Decl., ¶¶ 22-23. Even a short interruption in its long-term care pharmacy network is too long. A PBM that cannot provide a long-term care pharmacy network is not performing its core function – its clients will have no choice but to seek an alternative, and once clients switch to another provider, they are unlikely to return. *Id.* Indeed, MedImpact could be forced out of the Medicare Part D market for however long it takes to find or build a replacement pharmacy network, which would gravely threaten the viability of the company. *Id.*

*Bionpharma Inc. v. CoreRx, Inc*. is instructive. There, the court found "a strong showing" of irreparable harm where plaintiff, a generic pharmaceutical provider, would need "months to find an alternative supplier" if defendant breached its contractual obligations. *Bionpharma Inc. v. CoreRx, Inc*., 582 F.Supp.3d 167, 175 (S.D.N.Y. 2022) (finding that "[b]oth of these consequences will result in substantial injury to [plaintiff's] reputation and goodwill in the small generic pharmaceutical industry in which relationships and reputation are paramount"). The court held that injunctive relief was warranted because defendant's breach would leave plaintiff "unable to fulfil orders that it is under contractual obligation to supply" and force plaintiff "to decline new orders." *Id.* California federal courts have also recognized that the threat of being driven out of business and the inability to retain clients or generate new business all support a finding of irreparable harm. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

threat of being driven out of business is sufficient to establish irreparable harm.");
*Nutramax Lab'ys, Inc. v. Body Wise Int'l, Inc.*, 2019 WL 3210095, at *6 (C.D. Cal.
Apr. 10, 2019) ("[L]oss of goodwill, damage to reputation, and loss of business
opportunities are all valid grounds for finding irreparable harm.") (citations omitted).

*Third*, even if MedImpact is able to eventually piece together a replacement
long-term care pharmacy network, its brand and reputation will be irreparably
damaged as a result of being perceived as an inconsistent and unreliable network.
Halter Decl., ¶¶ 21-23.  Maintaining a positive reputation and goodwill is critical to
MedImpact's standing in the Medicare Part D market, as the patient population at
issue (and who are all covered through Medicare plans) is particularly sensitive to
any potential disruption of their ability to access their medications.  *See Bionpharma*,
582 F.Supp.3d at 175 (noting that "terminating the delivery of a unique product to a
distributor whose customers expect and rely on the distributor for a continuous
supply of that product almost inevitably creates irreparable damage to the good will
of the distributor," including its reputation as a "dependable distributor" (internal
citations omitted)).   Long-term care patients require consistent and prompt
fulfillment of their prescriptions.  Any delay, interruption, or change to their schedule
or ability to obtain medications will immediately and significantly impair
MedImpact's business reputation and damage the goodwill it has earned with Plan
Sponsors, long-term care facilities, and patients.  Even if no disruption actually
occurs, the risk or perceived risk that such disruption *could* occur (and the
corresponding serious medical consequences) is enough to seriously damage
MedImpact's reputation.  The Ninth Circuit has held that the "loss of control over
business reputation" and "damage to goodwill" constitute irreparable harm.  *Herb
Reed Enterprises, LLC v. Florida Ent. Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013);
*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)
("Evidence of threatened loss of prospective customers or goodwill certainly
supports a finding of the possibility of irreparable harm."); *Humana Ins. Co. v. Tenet*

*Health Sys.*, 2016 WL 5815907, at *3 (E.D. Cal. Oct. 4, 2016) (finding irreparable harm where change of network status would affect plaintiffs' goodwill with its enrollees and compromise ability to solicit and keep existing enrollees).

*Finally*, the damage to MedImpact's brand and reputation will also harm MedImpact's competitive position and decrease its market share. Either MedImpact will lose this business or, instead of facing potential disruption to their pharmacy services, MedImpact's clients will switch to a different pharmacy benefit manager – in both scenarios MedImpact will lose a significant portion of its market share. Halter Decl., ¶¶ 21-23. The Ninth Circuit is clear that the "[l]oss of market share" and harm to "competitive position" constitute irreparable harm. *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 948-49 (N.D. Cal. 2009) *aff'd* 658 F.3d 1150 (9th Cir. 2011); *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019).

In each of these ways, if MHA is allowed to unlawfully terminate the Elixir Agreement, it will cause irreparable harm to MedImpact, its clients, patients, and public health. No award of damages will suffice to compensate MHA's actions.

## C.    The Balance of Equities Tips Strongly In MedImpact's Favor

Importantly, the balancing of hardships tips decidedly in MedImpact's favor. On the one hand, if an injunction is granted against MHA, MHA and its member pharmacies will continue on as they have been for the twenty years since the Elixir Agreement went into place in May 2005. On the other hand, if injunctive relief is not granted against MHA, there will be numerous immediate consequences and tangible hardships as detailed above and in the accompanying declarations, to both MedImpact and, more importantly, the elderly Medicare patients who are members of health benefit or Medicare Part D plans serviced by MedImpact. *Novotech*, 2022 WL 17419168, at *5 (noting that where potential damage to safety of patients is involved, the balance of equities weighs "sharply" in favor of the moving party).

Plaintiff's requested TRO and injunction is both narrowly tailored and limited in scope so as to only ensure that the status quo is maintained in the short term and

that MHA continues to honor its contractual obligations through the duration of the Elixir Agreement and while the Parties adjudicate their outstanding dispute. *Price v. City of Stockton*, 390 F.3d 1105, 1117–18 (9th Cir. 2004) ("A preliminary injunction should be used only to maintain the status quo. Therefore, an injunction must be narrowly tailored 'to affect only those persons over which it has power,' and to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" (internal citations omitted)); *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (finding that an injunction must be "narrowly tailored to remedy the specific harm shown").

**D.    A Preliminary Injunction Serves the Public Interest**

The public interest also favors the requested injunction.  The Ninth Circuit explained that "'[t]he public interest inquiry primarily addresses impact on non-parties ***rather than parties***.'" *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (internal citations omitted & emphasis added)).  This inquiry should be considered as a distinct factor from the balance of hardships to the Parties.  *Id.* ("While we have at times subsumed this inquiry into the balancing of the hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected."); *Progressive Democrats for Soc. Just. v. Bonta*, 2021 WL 6496784, at *10 (N.D. Cal. July 16, 2021) (internal citations omitted); *see also QC Mfg., Inc. v. Solatube Int'l, Inc.*, 2021 WL 4963380, at *7 (C.D. Cal. Sept. 10, 2021) ("In assessing public interest, courts typically address the impact upon nonparties of granting or withholding injunctive relief.").

The public has a distinct interest in requiring MHA to abide by the Elixir Agreement.  First, and most important, patients residing in Care Settings depend on MHA's pharmacy network to receive their medications.  The proposed injunction will ensure that these vulnerable individuals continue to receive the medication they desperately need.  Halter Decl., ¶ 19.  Should Elixir desire to properly terminate the

Elixir Agreement at the end of 2025, they will be entitled to do so. Prior to a proper termination, MedImpact will be able to either contract with a new network of long-term care pharmacies or effectively communicate with its clients and its clients members to ensure they have adequate time to make any changes to their health benefit or Medicare Part D plans to maintain coverage. The public interest in avoiding the significant inconvenience to residents in Care Settings from having to "swap" coverage or services with insufficient notice and outside the Medicare Open Enrollment Period is, on its own, sufficient to weigh in favor of granting a preliminary injunction. *Flex-Plan Servs., Inc*, 2013 WL 12092543, at *8; *Novotech*, 2022 WL 17419168, at *6 (Defendant software company's threat to cut off access to software platform that stored clinical study data could "interrupt" clinical trials and potentially cause damage to viability of clinical trials or safety of trial patients, plaintiff established that injunction was in the public interest).

This threat to the public is imminent and will occur as early as January 1, 2025. Even if MHA argues that this risk is "speculative" (it is not), the Ninth Circuit has recognized that even a risk that is speculative can be "a valid public interest" that should be considered in determining whether to issue a preliminary injunction. *League of Wilderness Defenders*, 752 F.3d at 766. As with each of the other prongs of the preliminary injunction test, the public interest weighs heavily in MedImpact's favor.

### E. No Bond Should be Required Because Defendants Will Not Sustain Any Damages from the Proposed Preliminary Injunctive Relief.

While Federal Rule of Civil Procedure 65(c) normally requires the movant to post security, no bond should be required here because MHA will not suffer any damages as a result of any injunctive relief. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("Despite the seemingly mandatory language," this rule grants the court discretion to determine "the amount of security required, *if any*") (emphasis in original); *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000) (affirming district

court's decision not to require bond where the party sought to be enjoined "did not show that there would be any" damages); *Ikhana Grp., LLC v. Viking Air Ltd.*, 2023 WL 7348411, at *14 (S.D. Cal. Nov. 7, 2023) (setting bond at "zero" because although party to be enjoined "requested a substantial bond, [] it was unable to provide specifics that would support its substantial request.").

This is not a case where MHA will lose customers, revenue, or suffer any harm to its business as a result of the injunction MedImpact seeks.  Rather, Plaintiff's proposed remedy is preserving MHA's business and maintaining the status quo between the Parties that would otherwise be lost if MHA were permitted to unlawfully terminate the Elixir Agreement.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant MedImpact's Motion for TRO to prevent MHA from unlawfully terminating the Elixir Agreement on January 1, 2025 and maintain the status quo to allow sufficient time for the Parties to adjudicate their dispute and for the Court to determine whether a preliminary injunction requiring MHA to keep the Elixir Agreement in place until December 31, 2025 or until such time as they are permitted to terminate the agreement is warranted.

Dated:      December 30, 2024            COOLEY LLP
                                         MAZDA K. ANTIA


                                         By: */s/ Mazda K. Antia*
                                             Mazda K. Antia

                                         Attorneys for Plaintiff MedImpact